E-FILED
Friday, 08 March, 2019 04:09:54 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JASON R. SHELDON,<br>STEVEN HUNSBERGER<br>　　Plaintiff,<br><br>v.<br><br>STATE FARM MUTUAL<br>AUTOMOBILE INSURANCE<br>COMPANY; STATE FARM LIFE<br>AND ACCIDENT ASSURANCE<br>COMPANY; STATE FARM FIRE AND<br>CASUALTY COMPANY; STATE FARM<br>GENERAL INSURANCE COMPANY,<br><br>　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE No.: _____ |

### CLASS ACTION COMPLAINT

Plaintiffs Jason Sheldon and Steven Hunsberger, (referred to herein as "Plaintiffs") bring this action for damages and equitable relief against Defendant State Farm Mutual Automobile Insurance Company, Defendant State Farm Life and Accident Assurance Company, Defendant State Farm Fire and Casualty Company, and Defendant State Farm General Insurance Company d/b/a State Farm (hereinafter referred to, collectively, as either "State Farm" or "Defendant"). Plaintiffs worked for State Farm as Term Independent Contractor Agents ("TICA"), and file this action on behalf of a class for ERISA violations as all TICAs were misclassified as independent contractors and not provided 401(k), retirement, and pension benefits. Plaintiffs also file this case, individually, for willful fraud and deceit by State Farm.

### INTRODUCTION

1.　　Plaintiffs Sheldon and Hunsberger were both hired as TICAs by Defendant State Farm.

2.　　Defendant State Farm intentionally misclassifies all TICAs as independent

1

contractors.

3.      By not providing TICAs the same employment benefits as full time employees, Defendant State Farm has violated ERISA.

4.      Plaintiffs bring their claims for ERISA violations as representatives on behalf of a putative class of TICA employees.

5.      Additionally, Plaintiffs bring individual claims for fraud and deceit.

6.      Both Plaintiffs were induced to leave high earning careers based upon the fraudulent statements, actions, and conduct on behalf of Defendant State Farm.

7.      Particularly, Defendant State Farm, through its representatives and agents, induced Plaintiffs to create business proposals that set them up for failure.

8.      Defendant State Farm, through oral statements, emails, and written documentation, also induced Plaintiffs to continually invest more and more of their own money, into a business that was destined to fail.

9.      Ultimately, Defendant State Farm caused Plaintiffs significant economic harm by creating a fraudulent employment system.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. 1331 because the class-action claims of the named plaintiffs are based on 28 U.S.C. 1132 (e)(1) and the individual claims of the named plaintiffs are "supplemental claims" properly appended by reason of 28 U.S.C. 1367.

11.     This Court is a proper venue under 29 U.S.C. § 1132(e)(2) because the plan is administered in this venue, as the Defendant is headquartered here. This Court is also a proper venue under 29 U.S.C. § 1332(e)(2) because the Defendant may be found in this district.

## PARTIES

12.     Plaintiff, Jason Sheldon, is a resident and domicile of the State of New York whose principal residence is in Jamesville, within the County of Onondaga, and whose place of business is in Syracuse, within the County of Onondaga.

13.     Plaintiff, Steven Hunsberger, is a resident and domicile of the State of New York whose principal residence is in Cicero, within the County of Onondaga, and whose place of business is in Fayetteville, within the County of Onondaga.

14.     Defendant State Farm Mutual Automobile Insurance Company, Defendant State Farm Life and Accident Assurance Company, Defendant State Farm Fire and Casualty Company, and Defendant State Farm General Insurance Company are all Delaware Corporations, and all have their principal place of business at One State Farm Plaza, Bloomington, IL 61710. Collectively these Defendants do business as State Farm and are all domiciled in Illinois. State Farm has transacted and conducted business within the State of Illinois and in this division, including the administration of the ERISA plan at issue in this lawsuit

### I.      CLASS ACTION FACTS AND CLAIMS

15.     Plaintiffs Jason Sheldon and Steven Hunsberger are former Term Independent Contractor Agents (TICAs) who State Farm intentionally misclassified as Independent Contractors, instead of employees.

16.     As a result of this misclassification, Plaintiffs, and other TICAs (the similarly situated class), were wrongfully denied the same benefits as full time employees, in violation of ERISA.

**State Farm Treats Its "Agents" as "Employees" and Not "Independent Contractors"**

17.     State Farm employs thousands of Term Independent Contractor Agents (TICA) to exclusively sell State Farm insurance products.

18.     Each State Farm TICA must sign the State Farm Agent Agreement (the

3

"Agreement") as a mandatory condition of employment. The Agent Agreements for Plaintiffs are the same in all material respects to the Sheldon exemplar.

19.     The terms of the Agreement between each member of the Class and State Farm are the same in all material respects, and the Agreements for Plaintiffs are representative of the Agreements between State Farm and each member of the Class.

20.     The Agreement is, and at all relevant times has been, a contract of adhesion, drafted exclusively by State Farm, who gives the TICAs no opportunity to negotiate or change any terms and who requires the TICAs to sign the Agreement as presented by State Farm as a condition of employment.

21.     Not only is the Agreement a contract of adhesion, but State Farm refuses to honor the Agreement to treat the agents as "independent contractors" and, instead, reserves to itself the right to control the manner and method of the TICAs' business.

22.     Indeed, unbeknownst to the TICAs at the time of signing, in addition to the Agreement, State Farm has written and unwritten policies and procedures with which TICAs are required to comply as a condition of their employment.

23.     These policies and procedures permit State Farm to exercise almost total control over the TICAs' business.

24.     When TICAs do not follow a State Farm policy or procedure, whether disclosed or undisclosed, known or unknown, TICAs are subject to discipline by State Farm. State Farm regularly resorts to these written and unwritten policies to avoid paying benefits due to TICAs.

25.     Contrary to the plainly written and unambiguous provisions of plaintiffs' contracts, defendant uniformly, relentlessly, and without exception exercises complete control over the TICAs, including the named Plaintiffs, in every material aspect of the subject of the contracts which is selling insurance exclusively for State Farm. Examples of how State Farm

4

reserves the right to exercise, and does exercise, control over the TICAs and every material aspect of their business are as follows:

a)     *Exclusivity.* State Farm insists that TICAs exclusively represent State Farm; a TICA cannot sell insurance for any other insurance company. This is true even if the product the TICA has an opportunity to sell is not offered by State Farm.

b)     *Ownership of Agents' Book of Business.* TICAs do not own their books of business. The TICA is expected to solicit insurance business, pay for all of the expenses associated with solicitation, place the business with State Farm, but yet has no ownership interest in that business asset. If State Farm terminates the Agreement, or if the TICA terminates the Agreement, State Farm retains a right that it regularly exercises to "reassign" the book to different agents.

c)     *Dictates Over Location of Agent's Business.* When a TICA opens a State Farm office, the exact location of that office must be approved by State Farm and State Farm has a right to veto the office location chosen by the TICA. Furthermore, an TICA may not change the location of his or her business without State Farm's approval.

d)     *Control over compensation rates or method.* State Farm retains the right to change the TICAs' compensation without prior notice or consent.

e)     *Required computer hardware and software.* State Farm requires that the TICAs use computers provided by State Farm, which run the State Farm software. Among other things, this policy allows State Farm to control all policyholder information, because TICAs must maintain the information using this software. It also permits State Farm to monitor the TICAs' and their staffs' computer usage.  State Farm provides and installs the hardware and software.

f)  *Monitoring of all TICA activity.* State Farm has complete and absolute control of all information that relates to policyholders and can and does monitor TICAs' activities with respect to policyholder information. In fact, State Farm retains the ability to monitor every type of report relating to policyholders which TICAs view, copy or import to another system. State Farm also has the ability to monitor, and does monitor, the email correspondence of its TICAs and their office staff.

g)  *Monitoring and termination for "undesirable performance."* State Farm has the right to monitor TICAs' daily work and terminate agent for "undesirable performance."

h)  *Non-Competes.* State Farm requires a non-compete in the event the Agreement is terminated by either State Farm or the TICA. The non-compete precludes the TICA from trying to solicit any of his/her current customers, no matter how long the TICAs have provided services to such customers.

i)  *Production Requirements and Close Monitoring of Production.* State Farm sets production requirements and closely monitors whether TICAs are meeting these requirements. On information and belief, State Farm sets these production requirements on a per TICA basis.

j)  *Regulates In-Office Behavior.* State Farm regulates and controls the conduct of TICAs and their staff in offices. Specifically, State Farm assigns the location of TICA offices, assigns clients to the TICAs, dictates types of polices to be sold or promoted, dictates that TICAs should hire certain employees, requires TICAs to use a specific sales techniques and terminology, requires TICAs to attend mandatory meetings, hires and fires TICAs based upon whether or not they adhere

6

to the business proposal guidelines which State Farm creates, and requires TICAs
to pay for marketing to meet State Farm standards.

k)     *Advertising Approval.* State Farm controls all TICA advertising and must approve
all advertising.

l)     *Mandatory Meetings.* TICAs are required to attend meetings, and failure to comply
with this requirement triggers the "undesirable performance" flag and can be a basis
for termination.

26.     At all times relevant, State Farm asserted control over virtually all aspects of
Plaintiffs' and Class members' businesses.

27.     At all times relevant, State Farm and its TICAs enjoyed a continuing employment
relationship where both State Farm and its TICAs had the right to terminate the employment
relationship.

28.     At all times relevant, State Farm TICAs were integrated into State Farm's business
of selling insurance.

29.     Nonetheless, State Farm misclassified and continues to misclassify TICAs as
independent contractors.

30.     As a result of State Farm's misclassification of all TICAs as independent
contractors, Plaintiffs and the Class members were deprived of the rights and protections
guaranteed by state and federal law to employees, including their rights under ERISA.

### TICAs Are Excluded From All Other State Farm Plans

31.     State Farm provides benefits to employees through State Farm benefit plans.
Specifically, State Farm provides a retirement plan, a 401(k) plan, and a pension plan to all
employees. These employee benefit plans are subject to ERISA.

32.     Plaintiff and the Class members, had they been properly recognized as employees

7

during their terms of service, would or could have been Participants and therefore have colorable claims for vested benefits under ERISA.

33. By their mischaracterization of Plaintiffs and Class members as "independent contractors," however, Defendant has systematically excluded Plaintiffs and Class members from the definition of an "employee" eligible to participate in the 401(k), retirement, and pension plans, thereby denying Plaintiff and Class members benefits they are entitled to receive.

34. State Farm's conduct is exactly the type of conduct Congress intended to remedy by enacting ERISA and the TICAs are the individuals entitled to ERISA's protections.

**It Is Futile For Plaintiffs And The Class To Exhaust Administrative Remedies, If Any**

35. State Farm has for decades maintained that its agents, Plaintiffs and the Class, were independent contractors even when agents challenged that designation.

36. Accordingly, to the extent Plaintiffs' claim are construed to be directed to the interpretation of the plans and not their legality, and to the extent any administrative remedies were available, it would have been futile for Plaintiffs and the Class to pursue them.

**Class Allegations**

37. Plaintiffs bring this action as an individual case and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The Class is defined as all *individuals who signed the State Farm TICA Agreement, within the United States of America, as "TICA", during the Class Period*, as further defined and limited below (the "Class").

38. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling and accrual issues, and ending on the date of entry of judgment.

39. Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed by amendment or amended

complaint. Specifically excluded from the Class are Defendants and their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint-venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them, the Judge assigned to this action, and any member of the Judge's immediate family.

40.     **Numerosity**. The Class is so numerous that joinder of all members in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains hundreds, if not thousands, of similarly situated current and former State Farm TICAs scattered throughout the country.   These TICAs were parties to substantially similar, if not identical, State Farm Agent Agreements and were also subject to the same common scheme depriving them of employee benefits.

41.     **Existence and Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions, each of which yield a common answer, include, but are not limited to, the following:

       (A)     Whether Plaintiffs and Class Members have the requisite independence and discretion of independent contractors;

       (B)     Whether, based on the conduct of Defendants, Plaintiffs and the Class are, as a matter of law, employees;

       (C)     Whether Plaintiffs and the Class are entitled to State Farm's benefits plans because they are, in fact, employees;

       (D)     Whether Plaintiffs and the Class are entitled to reimbursement for benefits they should have been receiving as employees during their terms of

employment, but which they were improperly denied based on Defendants' misclassification of the Class as independent contractors and not employees;

(E)     Whether Plaintiffs and Class members are entitled to benefits under the various benefit plans State Farm extends to all other employees;

(F)     Whether, if Plaintiffs and the Class are "employees," that these employees represent a significant percentage of the total workforce such that State Farm would be required to include them within any employee benefit plan subject to ERISA and offered to all other employees;

(G)     Whether the actions of State Farm are applicable to the Class as a whole, entitling Class Members to injunctive relief;

(H)     Whether Plaintiffs and Class Members are entitled to reformation of State Farm's various benefits plans under ERISA § 502(a)(3) and corresponding recalculation and restitution of benefits improperly withheld by State Farm, in order to comply with ERISA's requirements;

42.     **Typicality**. Plaintiffs' claims are typical of the claims of the Class members in that Plaintiffs and each member of the Class all are or have been "agents" pursuant to an State Farm Agent Agreement, and they have suffered and will continue to suffer financial hardship and other damages as a result of Defendant's conduct.

43.     **Adequacy of Representation**. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

44.     **Superiority**. A class action is superior to all other available means for the fair and

efficient adjudication of this controversy. Given the investments that Class members made to become State Farm TICAs, it would now be virtually impossible for the members of the Class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not sustain it. Individualized claims brought by members of the Class would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

## II.    INDIVIDUAL FACTS AND CLAIMS

### Background Facts for Jason Sheldon, Individually

45.    In May 2016, Plaintiff was recruited by Craig Guillotte to become an agent intern. Plaintiff left his job in insurance in hopes of owning his own insurance business and being his own boss.

46.    After three interviews, Plaintiff was hired to begin the Agent Intern process. The agent intern process lasts 17 weeks. In May and June of 2016, Craig Guillotte and Neil Campbell (employees of the Defendant) explained to Plaintiff that he would be taught how to run his agency and learn about the State Farm systems and products, during the "agent intern process." However, this was not the case.

47.    The majority of training focused on simple conversation technique. This technique revolved around selling life insurance. Selling life insurance is the primary focus of new agents. Plaintiff later found out that selling life insurance was very important not only because it would influence his bonuses, but it also influences Plaintiff's Sales Leader's bonuses.

11

48.     Throughout the training Plaintiff worked on modules, which were difficult to understand for anyone without past State Farm experience. Plaintiff did not learn about State Farms live systems until the last three weeks of his training.

49.     The most important aspect of the recruitment process was the creation of Plaintiff's business proposal. From May 2016 to July 2016, Plaintiff had multiple, routine conversations both orally and in writing, with Craig Guillotte, Neil Campbell, Kristin Halligan, and Matt Johnson (all State Farm employees and representatives) wherein State Farm, through its representatives, explained to that Plaintiff the business proposal will serve as an example that Plaintiff will submit to State Farm, to determine whether or not Plaintiff should be hired as an agent intern. In that same time period, the same State Farm representatives explained that the proposal was also to be used to show that Plaintiff had the basic business acumen to set goals, budgets, and processes, necessary to manage a State Farm. It was never explained that the business proposal would be permanent and also a component of the final hiring criteria to become a State Farm Agent.

50.     Plaintiff was initially very unfamiliar with what it would take to run an agency, the processes, and a State Farm business. To combat this, from May to July of 2016, Craig Guillote, Plaintiff's recruiter, and Kristin Halligan, another State Farm employee, told Plaintiff what numbers to use in the proposal and what would look good to State Farm, so that he would have a good chance of becoming hired as an agent intern. During this same time period, Guillotte and Halligan also explained that Plaintiff's initial business proposal was a draft and that Plaintiff would have the ability to change the business proposal. Plaintiff finished his business proposal roughly four months before he even knew where his agency would be located or any other details about what the agency would look like.

51.     In October of 2016, Matt Johnson (a State Farm employee and/or representative) told Plaintiff which agency would be his and that the location of the agency had to be on Onondaga

12

Hill. Plaintiff had two weeks to find a location, which was near impossible because there was no available real estate in the required area. Plaintiff did not want his agency on Onondaga Hill, and if Plaintiff had known that he would be forced to locate his agency here, he would not have taken the position. However, at this time, Plaintiff had already quit his high earning job to become a State Farm agent intern, based on the representations made by the State Farm employees referenced in ¶¶ 49-50 of this Complaint, and could not reverse course without suffering immense financial hardship.

52.     In October of 2016, Plaintiff started to recruit team members for his agency. In November of 2016, at a company training program in Bloomington, Illinois (Defendant's principal place of business), State Farm management instructed Plaintiff and other agent interns in attendance that they could not advertise the position as a "State Farm team member," which made it hard to recruit team members.

53.     Before opening his agency, Plaintiff learned from his State Farm supervisors that he would be tracked and graded on his adherence to his business proposal created during the recruitment period from May to July of 2016. Based upon the representations made by State Farm representatives and/or employees from May to July of 2016 (as referenced in ¶¶ 49-50 in this Complaint) Plaintiff believed that his business proposal was supposed to simply be a draft and a working document that would be revised at various points before setting up his agency. In April of 2017, Plaintiff called his sale leader, Matt Johnson to see if he could adjust the numbers on his business proposal, but Plaintiff was told that he could not. At this point, Plaintiff discovered that the numbers in Plaintiff's business proposal exceeded all other agencies in the area, including the top preforming agencies. At this point, Plaintiff realized he had been coached to build a business proposal that was unattainable and could not change it.

54.     Plaintiff received his term independent contractor agent ("TICA") contract January

13

1, 2017 and opened the doors to his agency on January 2, 2017.

55.    Although the TICA title has "independent contractor" in the title, it is completely controlled by State Farm in every aspect. All activities were monitored by State Farm. For example, but not limited to: the hours worked, staffing levels, discipline of employees, appearance of the office, internal processes, the way Plaintiff spoke, budgets, mandatory meetings, compulsory offsite meetings, marketing, and advertising.

56.    In April of 2017, Plaintiff confronted Matt Johnson about the goals in his business proposal being higher than any active producing agent in his area. At this time, Johnson told Plaintiff that he could not change his business proposal.

57.    In Plaintiff's performance reviews, these same unrealistic goals are mentioned many times. Johnson would use the performance reviews to dictate Plaintiff's behavior (such as increasing marketing at Plaintiff's own expense), always threatening termination.

58.    Plaintiff invested his own money into the agency and the building, was working more than sixty hours per week, and spending more and more money, yet Matt Johnson and State Farm still demanded more investment of Plaintiff's time and money.

59.    Plaintiff was terminated on October 1, 2017 for allowing his team members to access the State Farm system using his log-in credentials. This was a common practice, and one that Plaintiff routinely did under State Farm supervision during the agent intern training. Matt Johnson was aware of this practice, and it was noted in Plaintiff's review.

60.    Ultimately, Plaintiff lost significant money because of the misrepresentations, fraud, and deceit perpetrated by State Farm and its employees and representatives.

### Background Facts for Steven Hunsberger, Individually

61.    In March 2014, Plaintiff was recruited by Craig Guillotte to become an agent intern. Plaintiff left his job in January 2015 in hopes of owning his own insurance business and being his

own boss.

62.    After two interviews, Plaintiff was hired to begin the TICA process. The agent intern process lasts 6 months. Craig Guillotte, Neil Campbell, Brenda Flagg and Kristen Halligan (employees of the Defendant) explained to Plaintiff that he would be taught how to run his agency and learn about the State Farm systems and products, during the "agent intern process". However, this was not the case.

63.    Throughout the training Plaintiff worked on modules, which were difficult to understand for anyone without past State Farm experience. Plaintiff did not learn about State Farms actual systems until the end of his training.

64.    The most important aspect of the recruitment process was the creation of Plaintiff's business proposal. From May to December 2014, Plaintiff had multiple, routine conversations both orally and in writing, with Brenda Flagg and Kristin Halligan (both State Farm employees and representatives) wherein State Farm, through its representatives, explained to that Plaintiff the business proposal will serve as an example that Plaintiff will submit to State Farm, to determine whether or not Plaintiff should be hired as an agent intern. In that same time period, the same State Farm representatives explained that the proposal was also to be used to show that Plaintiff had the basic business acumen to set goals, budgets, and processes, necessary to manage a State Farm. It was never explained that the business proposal would be permanent and also a component of the final hiring criteria to become a State Farm Agent.

65.    Plaintiff was initially very unfamiliar with what it would take to run an agency, the processes, and a State Farm business. To combat this, from May to December of 2014, Brenda Flagg and Kristin Halligan, another State Farm employee, told Plaintiff what numbers to use in the proposal and what would look good to State Farm, so that he would have a good chance of becoming hired as an agent intern. During this same time period, Flagg and Halligan also explained

15

that Plaintiff's initial business proposal was a draft and that Plaintiff would have the ability to change the business proposal. Plaintiff finished his business proposal before he even knew where his agency would be located or any other details about what the agency would look like.

66.     Before opening his agency, Plaintiff learned from his State Farm supervisors that he would be tracked and graded on his adherence to his business proposal created during the recruitment period from May to December of 2014. Based upon the representations made by State Farm representatives and/or employees from May to December of 2014 (as referenced in ¶¶ 65-66 in this Complaint) Plaintiff believed that his business proposal was supposed to simply be a draft and a working document that would be revised at various points before setting up his agency. Plaintiff asked Matt Johnson, Plaintiff's Sales Leader to see if he could adjust the numbers on his business proposal, but Plaintiff was told that he could not. At this point, Plaintiff discovered that the numbers in Plaintiff's business proposal exceeded other agencies in the area, including the top preforming agencies. At this point, Plaintiff realized he had been coached to build a business proposal that was unattainable and could not change it.

67.     Plaintiff received his term independent contractor agent ("TICA") contract and opened the doors to his agency on January 2016.

68.     Although the TICA title has "independent contractor" in the title, it is completely controlled by State Farm in every aspect. All activities were monitored by State Farm. For example, but not limited to: the hours worked, staffing levels, discipline of employees, appearance of the office, internal processes, the way Plaintiff spoke, budgets, mandatory meetings, marketing, and advertising.

69.     Plaintiff did not have a constant State Farm Sales Leader during his time as a TICA. Brenda Flagg was his initial Sales Leader through the recruitment process, but around March of 2015, Flagg left the position to open her own agency. Flagg was replaced by Neil Campbell from

16

March 2015 to August 2015. In August 2015, Campbell was replaced by Matt Johnson.

70.     In Plaintiff's performance reviews, State Farm cites these same unrealistic goals many times. Plaintiff's Sales Leaders would use the performance reviews to dictate Plaintiff's behavior (such as increasing marketing at Plaintiff's own expense) and threatening termination if these goals were not met.

71.     Plaintiff had invested his own money into the agency and the building, was working more than sixty hours per week, and spending more and more money, yet Plaintiff's Sales Leaders and State Farm still demanded more investment of Plaintiff's time and money.

72.     Plaintiff was told his contract would not be renewed on November 11, 2016, and officially closed his office on December 21, 2016.

73.     Ultimately, Plaintiff lost significant money due to the misrepresentations, fraud, and deceit perpetrated by State Farm and its employees and representatives.

## Specific Facts Regarding Individual Claims for Jason Sheldon

### I.     State Farm Fraudulently Recruited Plaintiff for TICA Opportunities

74.     Defendant State Farm uses State Farm agents to recruit and maintain new customers. Plaintiff learned of the State Farm agency opportunity after Plaintiff was solicited by Craig Guillotte, a State Farm representative, in May of 2016 about a term independent contractor agent (TICA) position. During an initial interview, potential new agents receive information about different State Farm agency opportunities. After completing an initial interview, potential new agent recruits go through a six to eight-week approval process before beginning a licensing and training program known as the "agent intern process." The agent intern process lasts for seventeen weeks, and at the conclusion, the interns then become term independent contractor agents (TICAs). The TICA period lasts another twelve months, and at the conclusion of the TICA period, TICAs then become State Farm agents.

75.     During the approval process, new agent recruits are given a detailed overview of the agency opportunity and are assessed by Defendant's representatives for their ability to succeed as a State Farm Agent.  Plaintiff was invited to continue in the approval process after his initial interview with Neil Campbell, in June of 2016.

76.     An initial step in Defendant's approval process is for new recruits to receive information regarding how a State Farm agency operates.  Plaintiff attended informational sessions where he was again given written details about the agent compensation opportunities. During the recruitment process the Business Proposal is created. The numbers Plaintiff was told to put in his Business Proposal were over inflated as evidenced by the other numbers in the area.

77.     During the recruitment period, Plaintiff and other new recruits were given statistics on agent retention rates, by State Farm representatives, to insert in their business proposals. Plaintiff reasonably believed that the statistics meant that a great percentage of individuals with similar agencies were profitable.  Approximately one year later, on or around February 1, 2017, Plaintiff learned that Defendant's TICA agents from his class of TICA recruits' retention rates were very different than Defendant initially represented.  In short, State Farm had been making inaccurate and misleading representations as to Plaintiff's likelihood of success as a State Farm agent. Plaintiff subsequently learned that nearly 33% of the TICA class did not receive contracts.

78.     One reason Plaintiff chose to pursue a different career opportunity was because he wanted to maintain his own business rather than work as an employee.  Because of this desire for professional independence, Plaintiff was especially intrigued by Defendants' representations during the recruitment and internship process. During the recruitment and internship process, Defendant State Farm's representatives highlighted in Plaintiff's field interview that the approval and internship process was an opportunity to "build a legacy," and "build a viable successful business." As discussed, the reality of a State Farm agency is that the agent has little to no control

18

over his business, and the likelihood of success is much lower than State Farm represents throughout the entirety of the process before one becomes an agent.

## II.     Plaintiff Begins Internship and Drafts Business Proposal Based Upon Defendant's Deliberate Misrepresentations and Fraudulent Data

79.     By August of 2016, Plaintiff had completed the approval process and was selected to begin Defendant's new agent internship program.   Once newly recruited agents are approved, Defendant's internship and training program begins.  This program lasts approximately seventeen weeks and includes self-study, classroom training, and licensing.

80.     The agent intern process was shortened from thirty-four weeks to seventeen weeks one cycle before Plaintiff started as an agent intern. This led to an incomplete learning cycle and resulted in agents being under trained.

81.     During the internship process, Plaintiff made preparations to open his agency.

82.     Plaintiff was required to create a business proposal for his agency. This document was originally completed by Plaintiff in early July of 2016 with the active assistance and guidance of Defendants as further outlined in ¶¶ 49-50 of this Complaint.  This proposal included a budget and estimated monthly marketing expenses.  Plaintiff's proposal also included a five-year income projection plan based on compensation calculators provided by Defendant during Plaintiff's internship.  Plaintiff was required to guess the approximate amount of Defendant's insurance products he would sell each month.  Because he had no basis for doing so he was encouraged to use, and used, Defendant's calculator to determine his yearly commission.  As Plaintiff revised and updated various drafts of his proposal, he was continuously encouraged by Defendant's representatives (as outlined in ¶¶ 49-50), to increase his basic production numbers.  Plaintiff reasonably believed these individuals had superior knowledge and information as to such issues and thus reasonably relied on these inflated representations as accurate information.

83.    At the end of the recruitment period, Plaintiff presented his proposal for approval to State Farm executives and leaders.  Defendant did not question Plaintiff's production goals or bonus estimates.  As Plaintiff was new to selling State Farm insurance products, he reasonably believed that Defendant's approval of his proposal indicated the numbers contained therein were accurate based on the market he was assigned to handle. Further, based on the representations made by State Farm representatives during the recruitment period, Plaintiff believed that he would be able to modify the business proposal once he started his agency.

84.    After approximately seventeen weeks, Plaintiff successfully completed Defendant's internship program, and in January 2017, Plaintiff opened the doors to a new State Farm agency.

### III.    Due to Defendant's Flawed and Fraudulent Compensation Calculators, Plaintiff Cannot Achieve Income Projections

85.    After opening the doors to the new agency, Plaintiff experienced some success with his agency.  Through continuous marketing, Plaintiff signed new customers for Defendant's products and maintained those accounts.  However, after less than one year of maintaining the agency, Plaintiff discovered that the projections created based upon the representations of State Farm representatives, and the data provided to him by State Farm, were significantly flawed.

86.    During the agent intern and TICA periods, Plaintiff was encouraged by Defendant to sell life insurance policies, in all situations. While constantly disguised as needs-based selling, it became apparent that selling life insurance was very important to State Farm, so much so that Plaintiff's bonuses were affected by it as other methods of selling were discouraged.

87.    Beginning in January of 2017, Defendant's representatives routinely encouraged Plaintiff to bump up his monthly marketing investment. On a monthly basis, Matt Johnson would indicate that for Plaintiff to remain employed, he would need to increase his marketing budget, at

his own expense.  After coming to the realization that State Farm had misrepresented the realities of running a State Farm agency, Plaintiff was not in a position to quit TICA.  Plaintiff had spent a significant amount of personal funds on a business in which he had no ownership.  When Plaintiff expressed income concern to Defendant's representatives, he was repeatedly told to increase his already high marketing expenses.  Despite Plaintiff's best efforts, Plaintiff failed to achieve his projected income, despite spending over $100,000 of his own personal funds on his agency.

88.  Plaintiff invested a great deal of his own money and was far from reaching the income goals projected during his internship using Defendant's fraudulent compensation calculators.  In actuality, his realistic income was significantly less than the projections created using the deceptive and fraudulent State Farm materials – the same materials that were ultimately reviewed and approved by State Farm's representatives and management.

89.  Due to State Farm's deliberate and repetitive misrepresentations regarding the reality of owning a State Farm agency (including but not limited to the creation of a permanent business proposal with faulty and fraudulent data provided by State Farm) Plaintiff suffered significant economic losses by leaving a lucrative career, and spending a large sum of money to attempt to create a State Farm agency that had no chance of success.

### Specific Facts Regarding Individual Claims for Steven Hunsberger

### I.  State Farm Fraudulently Recruits Plaintiff for TICA Opportunities

90.  Defendant State Farm uses State Farm agents to recruit and maintain new customers.  Plaintiff learned of the State Farm agency opportunity after Plaintiff was solicited by Craig Guillotte, a State Farm representative, on March 28, 2014 through an email on LinkedIn, about a term independent contractor agent (TICA) position.

91.  On April 28, 2014, Plaintiff had a one-on-one meeting with Brenda Flagg, a State Farm Representative, to discuss the TICA opportunity. From this meeting, Flagg said that she

wanted Plaintiff to put together a business plan and projections for the formal initial interview. Plaintiff had to go through a personality assessment. Plaintiff "passed" the personality assessment and was assigned an initial interview.

92.    On May 28, 2014, Plaintiff had his initial interview with Brenda Flagg, Neil Campbell and Kristen Halligan. In this initial interview, potential new agents receive information about different State Farm agency opportunities.   During this interview, Plaintiff showed Defendant an example business proposal and projections, that he had put together, using generic Syracuse territory numbers. Defendant used this example business proposal to "better understand Plaintiff's business acumen." As a result of this interview, Plaintiff was moved to the "approved candidate pool."

93.    During the approval process, new agent recruits are given a detailed overview of the agency opportunity and are assessed by Defendant's representatives for their ability to succeed as a State Farm Agent.

94.    An initial step in Defendant's approval process is for new recruits to receive information regarding how a State Farm agency operates.  Plaintiff attended informational sessions where he was again given written details about the agent compensation opportunities.  During the recruitment process the business proposal is created. Plaintiff also met with Brenda Flagg to discuss the State Farm business opportunity.

95.    On December 17, 2014, Plaintiff had a one-on-one dinner with Brenda Flagg to prepare for Plaintiff's final interview. Flagg also went through Plaintiff's business proposal and told him what numbers would be acceptable to the State Farm representatives in his final interview. Flagg told Plaintiff that the numbers in his business proposal "better make him travel." This is a phrase that State Farm uses to refer to numbers that qualify you for travel opportunities, the step beyond bonuses. Plaintiff was told what numbers to put in his business proposal by Brenda Flagg

and Kristen Halligan.  Plaintiff later discovered that the numbers he was told to use in his business proposal by the State Farm representatives were highly inflated compared to actual numbers in his territory.

96.      After completing the initial interview, potential new agent recruits go through a six to eight-week approval process before beginning a licensing and training program known as the "agent intern process".  The agent intern process lasts six months and at the conclusion, the interns then become term independent contractor agents (TICAs).  The TICA period lasts another nine months, and at the end of the TICA period, TICAs then become State Farm agents.

97.      Plaintiff left his former, high-paying job in mid-January 2015 and officially became a State Farm employee on February 2, 2015. One reason Plaintiff chose to pursue a different career opportunity was because he wanted to maintain his own business rather than work as an employee. Because of this desire for professional independence, Plaintiff was especially intrigued by Defendants' representations during the recruitment and internship process. During the recruitment and internship process, Defendant State Farm's representatives, including Brenda Flagg, highlighted in Plaintiff's field interview that the approval and internship process was an opportunity to "build a legacy," "build a viable successful business," and "have unlimited income potential." As discussed, the reality of a State Farm agency is that the agent has little to no control over his business, and the likelihood of success is much lower than State Farm represents throughout the entirety of the process before one becomes an agent.

## II.      Plaintiff Begins Internship and Drafts Business Proposal Based Upon Defendant's Deliberate Misrepresentations and Fraudulent Data

98.      On December 18, 2014 Plaintiff completed the approval process and was selected to begin Defendant's new agent internship program.   Once newly recruited agents are approved, Defendant's internship, licensing, and training program begins.    This program lasted

approximately twenty-six weeks and included licensing, self-study, classroom training, and field development.

99.     During the internship process, Plaintiff made preparations to open his agency.

100.     Plaintiff was required to create a business proposal for his agency. The proposal document was originally completed by Plaintiff on December 18, 2014, with the active assistance and guidance of Brenda Flagg and Kristen Halligan as further outlined in ¶¶ 65-66 of this Complaint.  This proposal included a budget and estimated monthly marketing expenses. Plaintiff's proposal also included a five-year income projection plan based on compensation calculators provided by Defendant during Plaintiff's internship.  Plaintiff was required to guess the approximate amount of Defendant's insurance products he would sell each month.  Because he had no basis for doing so he was encouraged to use, and used, Defendant's calculator to determine his yearly commission.  As Plaintiff revised and updated various drafts of his proposal, he was continuously encouraged by Brenda Flagg and Kristen Halligan (as outlined in ¶¶ 65-66), to increase his basic production numbers.  Throughout the process, Plaintiff was always told that the numbers he used "better make him travel," which is a level you obtain where you earn an all-inclusive trip for you and a plus one. Plaintiff would later realize that this was completely unattainable for a TICA seeing as though only three out of twenty-five agents in his area reached this level after at least ten of years of employment. Plaintiff reasonably believed these individuals had superior knowledge and information as to such issues and thus reasonably relied on these inflated and fraudulent representations as accurate information.

101.     On December 18, 2014, Plaintiff attended an official site interview for the Fayetteville location. This interview was with Brenda Flagg, Kristen Halligan in person, as well as Joe Spicer, the Vice-President of State Farm on a conference call.  Plaintiff presented his proposal (with the numbers provided by State Farm) for approval to State Farm executives and

leaders. Defendant did not question Plaintiff's production goals or bonus estimates. As Plaintiff was new to selling State Farm insurance products, he reasonably believed that Defendant's approval of his proposal indicated the numbers contained therein were accurate based on the market he was assigned to handle. Further, based on the representations made by State Farm representatives during the recruitment period, Plaintiff believed that he would be able to modify the business proposal once he started his agency.

102.    After approximately ten months, Plaintiff successfully completed Defendant's internship program, and in January 2016, Plaintiff opened the doors to a new State Farm agency.

### III.    Due to Defendant's Flawed and Fraudulent Compensation Calculators, Plaintiff Cannot Achieve Income Projections

103.    After opening the doors to the new agency, Plaintiff experienced some success with his agency. Through continuous marketing, Plaintiff signed new customers for Defendant's products and maintained those accounts. However, after less than one year of maintaining the agency, Plaintiff discovered that the projections created based upon the representations of State Farm representatives, and the data provided to him by State Farm, were significantly flawed.

104.    Plaintiff did not have a constant State Farm Sales Leader during his time as a TICA. Brenda Flagg was his initial Sales Leader through the recruitment process, but around March of 2015, Flagg left the position to open her own agency. Flagg was replaced by Neil Campbell from March 2015 to August 2015. In August 2015, Campbell was replaced by Matt Johnson. With the constant rotation of Sales Leaders, Plaintiff never had any consistent or proper training during his time as a TICA. When speaking to other agents about his situation, they said they felt like Plaintiff was "thrown to the wolves."

105.    Beginning in March of 2016, Defendant's representatives routinely encouraged Plaintiff to increase his monthly marketing investment. On a monthly basis, Defendant would

25

indicate that for Plaintiff to remain employed, he would need to increase his marketing budget, at his own expense. Plaintiff's sales leader would run Plaintiff's sales numbers and told him that he could always purchase more marketing and advertising materials.

106.    After coming to the realization that State Farm had misrepresented the realities of running a State Farm agency, Plaintiff was not in a position to quit TICA. Plaintiff had spent a significant amount of personal funds on a business in which he had no ownership. When Plaintiff expressed income concern to Defendant's representatives, he was repeatedly told to increase his already high marketing expenses. Despite Plaintiff's best efforts, Plaintiff failed to achieve his projected income, despite spending over $70,000 of his own personal funds on his agency.

107.    Plaintiff had one consistent employee the year he was open and had six others that were either terminated or quit. Plaintiff extended numerous opportunities to other potential employees, but he could not compete with other job offers. Plaintiff was told by Defendant that he needed to hire more employees. However, the hiring process not only took a lot of time but was also quite expensive for Plaintiff. Before any employee could start working, they had to go through licensing and training, costing Plaintiff over $1200 per new employee. Plaintiff also had to pay the employee, during the training period, one month's salary. Plaintiff was told by his sales leader that State Farm was "slow to hire and quick to fire."

108.    Plaintiff invested a great deal of his own money and was far from reaching the income goals projected during his internship using Defendant's fraudulent compensation calculators. Defendant's income projections were also based on a score card/bonus system. Defendant never informed Plaintiff that very few new agents actually hit these bonuses. Defendant pushes the bonuses to new recruits as if everyone gets them, when in reality, only twenty percent of State Farm agents in Plaintiff's area actually achieve the bonus. In actuality, Plaintiff's realistic income was significantly less than the projections created using the deceptive and fraudulent State

26

Farm materials – the same materials that were ultimately reviewed and approved by State Farm's representatives and management.

109.    Due to State Farm's deliberate and repetitive misrepresentations regarding the reality of owning a State Farm agency (including but not limited to the creation of a permanent business proposal with faulty and fraudulent data provided by State Farm) Plaintiff suffered significant economic losses by leaving a lucrative career, and spending a large sum of money to attempt to create a State Farm agency that had no chance of success.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**DECLARATORY RELIEF UNDER ERISA (Class Wide)**

110.    Plaintiffs, for themselves and on behalf of all Class members, seek a declaration pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and 28 U.S.C. §§ 2201 and 2202, of their rights under federal law and Defendant's Agreements and plans and the rights and liabilities of the parties herein. Specifically, Plaintiffs, for themselves and on behalf of all Class members, seek a declaration:

a)      That they are "employees";

b)      That Plaintiffs and Class members are "employees" eligible for benefits under the plan or plans Defendant offers to other employees;

c)      That certain Plan provisions violate ERISA; and

d)      That Plaintiffs and the Class are entitled to reformation of the contracts and restitution of benefits improperly withheld by State Farm, in order to comply with ERISA's requirements.

**SECOND CAUSE OF ACTION**

## CLAIMS FOR BENEFITS UNDER ERISA § 502(a)(1)(B) DEFENDANT'S BENEFITS PLANS OFFERED TO OTHER EMPLOYEES (Class Wide)

111.   ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary of a plan to bring a civil action to recover benefits due under the terms of the plan, to enforce his rights under the terms of the plan, and to clarify his rights to future benefits under the plan.

112.   The Defendant provides a retirement plan, a 401(k) plan, a group health care plan, a group dental plan, and group life plan, a pension plan, and a long-term disability plan to current employees, all of which are employee benefit plans subject to ERISA.

113.   State Farm's retirement plan covers substantially all of the Defendant's employees who have attained age 21 and completed one year of service.

114.   All of Defendant's employees are eligible to participate in State Farm's 401(k) plan, group health care plan, group dental plan, group life plan, and long-term disability plan.

115.   As employee benefit plans subject to ERISA, the State Farm retirement plan, 401(k) plan, group health care plan, group dental plan, group life plan, and long term disability plan must comply with 26 U.S.C. § 410(b) and § 105(h), including the minimum coverage requirements. *See also* 29 U.S.C. § 1202(c) (explicitly incorporating Treasury regulations promulgated under 26 U.S.C. §§ 410(a), 411 & 412).

116.   A plan that fails to comply with the requirements of 26 U.S.C. § 410(b) and § 105(h), including the minimum coverage requirements, must be brought into retroactive compliance. *See e.g.,* 26 C.F.R. § 1.410(b)-8(a)(1) ("A plan must satisfy section 410(b) for a plan year… [A]mendments retroactively correcting a plan in accordance with § 1.401(a)(4)- 11(g) are taken into account as plan provisions in effect as of the last day of the plan year.").

117.   Relying on their mischaracterization of Plaintiffs and Class members as

"independent contractors," however, Defendant State Farm has systematically excluded Plaintiffs and Class members from the definition of an "employee" covered by the State Farm retirement plan or eligible to participate in the State Farm 401(k) plan, group health care plan, group dental plan, group life plan, and long-term disability plan.

118.   Plaintiffs and Class members are "employees" under ERISA and the Class represents a significant percentage of Defendant's workforce that Defendant had to cover under the terms of the State Farm Plans to comply with 26 U.S.C. § 410(b) and § 105(h), including the minimum coverage requirements.

119.   By excluding Plaintiffs and Class members from the definition of an "employee" covered by the State Farm Plans, Defendant has violated 26 U.S.C. § 410(b) and § 105(h), including the minimum coverage requirements. Indeed, upon information and belief, the Class represents at least 25% of Defendants workforce.

120.   Defendant's refusal to implement State Farm Plans in compliance with ERISA and 26 U.S.C. § 410(b) and § 105(h), including the minimum coverage requirements, was unlawful.

121.   Defendant's ERISA violations have damaged Plaintiffs and the Class, including but not limited to benefits due and owing had the retirement plan, a 401(k) plan, a group health care plan, a group dental plan, and group life plan, and a long-term disability plan offered to all other current employees complied with ERISA.

122.   Defendant's conduct has caused actual harm to Plaintiffs and Class members in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

**CLAIM FOR OTHER APPROPRIATE RELIEF UNDER ERISA § 502(a)(3)**

**DEFENDANTS' BENEFITS PLANS OFFERED TO THER EMPLOYEES (Class Wide)**

123.  ERISA Section 502(a)(3) empowers a plan participant or beneficiary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan" 29 U.S.C. § 1132(a)(3).

124.  Relying on their mischaracterization of Plaintiffs and Class members as "independent contractors," Defendant has systematically excluded Plaintiffs and Class members from the definition of an "employee" covered by the State Farm retirement plan or eligible to participate in the State Farm 401(k) plan, group health care plan, group dental plan, group life plan, and long-term disability plan.

125.  Plaintiffs and Class members are "employees" under ERISA and the Class represents a significant percentage of Defendants' workforce that Defendants had to cover under the terms of the State Farm Plans to comply with 26 U.S.C. § 410(b) and § 105(h), including the minimum coverage requirements.

126.  By excluding Plaintiffs and Class members from the definition of an "employee" covered by the State Farm retirement plans, 401(k) plans, group health care plans, group dental plans, group life plans, and long-term disability plans, Defendant has violated 26 U.S.C. § 410(b) and § 105(h), including the minimum coverage requirements. Indeed, upon information and belief, the Class represents at least 25% of Defendants workforce.

127.  Defendant State Farm's refusal to implement the State Farm retirement plans, 401(k) plans, group health care plans, group dental plans, group life plans, and long term disability plans in compliance with ERISA and 26 U.S.C. § 410(b) and § 105(h), including the minimum coverage requirements, was unlawful and a breach of their fiduciary duties to administer a plan in accordance with ERISA. *See* 29 U.S.C. § 1104(a)(1)(D) ("a fiduciary shall

discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.").

128.    The Plaintiffs and Class members are entitled to equitable relief under ERISA § 502(a)(3), including reforming the State Farm Plans to include Plaintiffs and the Class and to comply with ERISA and 26 U.S.C. § 410(b) and § 105(h), including the minimum coverage requirements, and requiring Defendants to pay restitution in the form of a surcharge or otherwise credit Plaintiffs and Class Members for all ERISA benefits to which they are retroactively entitled under the State Farm Plans in order to be made whole and to prevent Defendants' unjust enrichment.

129.    Defendant's conduct has caused actual harm to Plaintiffs and Class members in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

### FRAUD AND DECEIT (Individual – Jason Sheldon)

130.    From the time period of on or around May 2016 to approximately October 2017, through their material affirmative statements and omissions of material fact they were bound to disclose in order to make their other statements not misleading for want of disclosure of such facts, or because they had superior knowledge of such facts, which are set forth in detail below, Defendant State Farm either directly and/or through its representatives, misrepresented to Plaintiff the true nature of TICA and State Farm agencies.  Specifically, Defendant misrepresented to Plaintiff the following:

      e)      The total amount needed to invest in order to create not just a successful agency, but an agency that barely survived;

f)      The control Plaintiff would have over his own budget;

g)      The importance of an accurate business proposal; and

h)      The compensation calculator that determines false income projections for new agents, including Plaintiff, given to Plaintiff by individual Defendant.

131.    At the time that Defendant and its representatives, including Craig Guillotte, Neil Campbell, Kristin Halligan, and Matt Johnson (all State Farm employees and representatives), made those misrepresentations and omissions, they knew that they were false and misleading or had no reasonable basis for making such affirmative statements.  Nevertheless, Defendants made these misrepresentations and omissions of material fact with the purpose of inducing the Plaintiff to act in reliance thereon, quit his job and expend significant amounts of his personal funds in order to bring in brand new State Farm customers:

i)      From May 2016 to July 2016, Plaintiff had multiple, conversations both orally and in writing, with Craig Guillotte, Neil Campbell, Kristin Halligan, and Matt Johnson (all State Farm employees and representatives) wherein State Farm, through its representatives regarding the business proposal. The State Farm representatives explained that the proposal was to be used to show that Plaintiff had the basic business acumen to set goals, budgets, and processes, necessary to manage a State Farm. It was never explained that the business proposal would be permanent and also a component of the final hiring criteria to become a State Farm Agent.

j)      From May to July of 2016, Craig Guillote, Plaintiff's recruiter, and Kristin Halligan, another State Farm employee, told Plaintiff what numbers to use in the proposal and what would look good to State Farm. During this same time period, Guillotte and Halligan also explained that Plaintiff's initial business proposal was

32

a draft and that Plaintiff would have the ability to change the business proposal. This was in fact false. Plaintiff was not able to change the business proposal at any point, even after realizing the numbers he was told to put in the proposal were unattainable.

k)  In October of 2016, Matt Johnson (a State Farm employee and/or representative) told Plaintiff which agency would be his, and that he had two weeks to find a location. Plaintiff asked if he could open an office in Nedrow, but Plaintiff was told that he could not choose the location of his office and that it had to be on Onondaga Hill. Plaintiff would not have taken the position had be known that he would be unable to choose a location for his agency.

l)  Before opening his agency, Plaintiff learned from his State Farm supervisors that he would be tracked and graded on his adherence to his business proposal created during the recruitment period from May to July of 2016. Based upon the representations made by State Farm representatives and/or employees from May to July of 2016, Plaintiff believed that his business proposal was supposed to simply be a draft and a working document that would be revised at various points before setting up his agency. Plaintiff would not have put such unattainable numbers in his business proposal had he known this and would not have become a TICA had he known the proposal to be permanent, with the supplied numbers.

m)  In April of 2017, Plaintiff called his sales leader, Matt Johnson, to see if he could adjust the numbers on his business proposal, but Plaintiff was told that he could not. At this point, Plaintiff realized he had been coached to build a business proposal that was unattainable and could not change it.

n)  Although TICA has "independent contractor" in the title, it is completely controlled

by State Farm in every aspect. All activities were monitored by State Farm. For example, but not limited to: the hours worked, staffing levels, discipline of employees, appearance of the office, internal processes, the way Plaintiff spoke, budgets, mandatory meetings, marketing, and advertising.

o)   In April of 2017, Plaintiff confronted Matt Johnson about the goals in his business proposal being higher than any active producing agent in his area. Johnson then told Plaintiff that he could not change his business proposal.

p)   Plaintiff had invested his own money into the agency and the building, was working more than sixty hours per week, and spending more and more money, yet Matt Johnson and State Farm still demanded more investment of Plaintiff's time and money.

132.   Such statements and omitted facts were material, since if Defendants accurately described the true nature of the TICA opportunity, then newly recruited agents, including Plaintiff, would not invest in the TICA opportunity.

133.   As a result, Defendant engaged in a systematic campaign to fraudulently convey the impression, through representatives' statements and illustrations that the TICA opportunity would be profitable.

134.   As a new member of State Farm, Plaintiff justifiably relied on Defendant and its representatives, including Craig Guillotte, Neil Campbell, Kristin Halligan, and Matt Johnson fraudulent misrepresentations and omissions to his detriment.

135.   As a direct and foreseeable result of Defendant's conduct, Plaintiff was harmed and seeks recovery in the form of monetary damages.

**FIFTH CAUSE OF ACTION**

**FRAUD AND DECEIT (Individual – Steven Hunsberger)**

136.    From the time period of on or around March 2014  to approximately September 2016, through their material affirmative statements and omissions of material fact they were bound to disclose in order to make their other statements not misleading for want of disclosure of such facts, or because they had superior knowledge of such facts, which are set forth in detail below, Defendant State Farm either directly and/or through its representatives, misrepresented to Plaintiff the true nature of TICA and State Farm agencies.  Specifically, Defendant misrepresented to Plaintiff the following:

a)      The total amount needed to invest in order to create not just a successful agency, but an agency that barely survived;

b)      The control Plaintiff would have over his own budget;

c)      The importance of an accurate business proposal; and

d)      The compensation calculator that determines false income projections for new agents, including Plaintiff, given to Plaintiff by individual Defendant.

137.    At the time that Defendant and its representatives, including Craig Guillotte, Neil Campbell, Kristin Halligan, and Brenda Flagg. (all State Farm employees and representatives), made those misrepresentations and omissions, they knew that they were false and misleading or had no reasonable basis for making such affirmative statements.  Nevertheless, Defendant made these misrepresentations and omissions of material fact with the purpose of inducing the Plaintiff to act in reliance thereon, quit his job and expend significant amounts of his personal funds in order to bring in brand new State Farm customers":

q)      From March to December of 2014, Plaintiff had multiple, conversations both orally and in writing, with Craig Guillotte, Neil Campbell, Kristin Halligan, Brenda Flagg, and Matt Johnson (all State Farm employees and representatives) wherein State Farm, through its representatives, assisted Plaintiff regarding the

35

business proposal. The State Farm representatives explained that the proposal was to be used to show that Plaintiff had the basic business acumen to set goals, budgets, and processes, necessary to manage a State Farm. State Farm never explained that the business proposal would be permanent and a final hiring criterion to become a State Farm Agent.

r)    From March to December of 2014, Brenda Flagg, Plaintiff's Sales Leader, and Kristin Halligan, another State Farm employee, told Plaintiff what numbers to use in the proposal and what would look good to State Farm. During this same time period, Flagg and Halligan also explained that Plaintiff's initial business proposal was a draft and that Plaintiff would have the ability to change the business proposal. This was in fact false. Plaintiff was not able to change the business proposal at any point, even after realizing the numbers he was told to put in the proposal were unattainable.

s)    On December 18, 2014, Brenda Flagg (a State Farm employee and/or representative) told Plaintiff that his location would have to be in Fayetteville. While Plaintiff was looking for specific office space, Flagg informed him that the office space Plaintiff wanted was too far from the existing location and to close to another agent, so he would have to find another location within the Fayetteville area.

t)    Before opening his agency, Plaintiff learned from his State Farm Sales Leaders that he would be tracked and graded on his adherence to his business proposal created during the recruitment period from March to December of 2014. Based upon the representations made by State Farm representatives and/or employees from May to December of 2014, Plaintiff believed that his business proposal was

supposed to simply be a draft and a working document that would be revised at various points before setting up his agency. Plaintiff would not have put such unattainable numbers in his business proposal had he known this and would not have become a TICA had he known the proposal to be permanent, with the supplied numbers.

u)  Although TICA has "independent contractor" in the title, it is completely controlled by State Farm in every aspect. All activities were monitored by State Farm. For example, but not limited to: the hours worked, staffing levels, discipline of employees, appearance of the office, internal processes, the way Plaintiff spoke, budgets, mandatory meetings, marketing, and advertising.

v)  During Plaintiff's three-month performance review, Plaintiff realized how strictly he was being held to the numbers in his business proposal. After this review, around April 2016 or May 2016, Plaintiff confronted Matt Johnson, Plaintiff's Sales Leader about the goals in his business proposal being higher than any active producing agent in his area. At this time, his Johnson told Plaintiff that he could not change his business proposal.

w)  Plaintiff had invested his own money into the agency and the building, was working more than sixty hours per week, and spending more and more money, yet his Sales Leader and State Farm still demanded more investment of Plaintiff's time and money.

138.  Such statements and omitted facts were material, because if Defendant had accurately described the true nature of the TICA opportunity, then newly recruited agents, including Plaintiff, would not invest in the TICA opportunity.

139.  As a result, Defendant engaged in a systematic campaign to fraudulently convey

37

the impression, through representatives' statements and illustrations that the TICA opportunity would be profitable.

140.    As a new member of State Farm, Plaintiff justifiably relied on Defendant and its representatives', including Craig Guillotte, NeilCampbell, Kristin Halligan, Brenda Flagg and Matt Johnson, fraudulent misrepresentations and omissions, to his detriment.

141.    As a direct and foreseeable result of Defendant's conduct, Plaintiff was harmed and seeks recovery in the form of monetary damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs individually, and on behalf of all other similarly situated for the class claim, demand judgment against the Defendant and relief from this Court as follows for their class claims:

1.    An order certifying the Class as described with the named Plaintiffs as Class Representative(s) and appointing undersigned counsel as Lead Counsel for the Class.

2.    A declaration that Plaintiffs and Class Members are legal "employees," for all purposes, including, but not limited to, ERISA;

3.    A declaration the because Defendants excluded Plaintiffs and the Class from participating in the State Farm Plans, the State Farm Plans are not in compliance with ERISA and 26 U.S.C § 410(b) and § 105(h), including the minimum coverage requirements;

4.    Payment to Plaintiffs and the Class of all amounts due under the State Farm Plans complied with ERISA;

5.    An order reforming the State Farm Plans to include Plaintiffs and the Class to comply with ERISA and 26 U.S.C § 410(b) and §105(h), including the minimum

coverage requirements, and requiring Defendants to pay restitution in the form of a surcharge or otherwise credit Plaintiffs and Class Members for all ERISA benefits to which they are retroactively entitled under the State Farm Plans in order to be made whole and to prevent Defendant's unjust enrichment;

6.    An injunction barring Defendant from continuing to misclassify the Class as "independent contractors" and to classify them as "employees";

7.    An award of attorneys' fees, plus the costs and expenses of this action;

8.    Pre- and post-judgment interest, as afforded by law;

9.    All such other legal and equitable relief to which Plaintiffs and Class are entitled.

WHEREFORE, Plaintiffs additionally request that the Court enter judgement for their individual claims as follows:

1.    Actual compensatory and punitive money damages;

2.    Prejudgment and post judgment interest as provided by law;

3.    Equitable relief;

4.    Attorneys' fees, expenses, and costs of this action; and

5.    For such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury on all issues and claims for which a right of jury trial exists and an advisory jury as to all such other claims.

Respectfully submitted,


s/ Robert M. Foote
Robert M. Foote


***Counsel for the Plaintiffs***

OF COUNSEL:

FOOTE MILEKE CHAVEZ ONEIL, LLC
Elizabeth Chavez (#6323726)
10 West State Street
Suite 200
Geneva, IL  60134
Phone: (630) 232-7450
Facsimile: (630) 232-7452
rmf@fmcolaw.com
ecc@fmcolaw.com

D.G. Pantazis, Jr. (pro hac vice application forthcoming)
WIGGINS, CHILDS, PANTAZIS,
FISHER, & GOLDFARB, LLC
The Kress Building
301 19th Street North
Birmingham, AL 35203
205-314-0557
dgpjr@wigginschilds.com